## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **WILLIAM KING, ANTHONY GUGLIUZZA,** and **STEPHEN DARDZINSKI**, on behalf of themselves and on behalf of a class of others similarly situated, | ) ) ) ) ) ) | Judge:_____ |
| Plaintiffs, | ) ) | **18-1115 C** <br> Docket No.:_____ |
| v. | ) ) | |
| **THE UNITED STATES OF AMERICA** | ) ) | **FILED** <br> JUL 3 1 2018 |
| Defendant. | ) ) ) | U.S. COURT OF FEDERAL CLAIMS |

### CLASS ACTION COMPLAINT

Plaintiffs William King, Anthony Gugliuzza, and Stephen Dardzinski,

individually and on behalf of a class of others similarly situated, allege as follows:

### INTRODUCTION

1. Until December 2014, federal law expressly prohibited the Plaintiffs' pension

   plan from reducing Plaintiffs' vested pension benefits: until and unless a

   pension fund was broke, a retiree's monthly payment could not be reduced.

   Recipients had an ironclad legal right to receive monthly payments in an

   identical, predictable amount until they died or, if the fund ran out of money,

   reduced payments from a government insurance plan. This is a case about

1

whether the federal government may authorize a fund with more than a billion dollars in it to cut vested pensions retroactively, overturning the rules that had governed the plaintiffs' pensions for decades. The lawsuit seeks to establish that the government, by authorizing those cuts, engaged in an uncompensated taking of the Plaintiffs' property—their money. Plaintiffs have a legal right to compensation.

2. In December 2014, a federal law (the Kline-Miller Multiemployer Pension Reform Act of 2014, or "MPRA") authorized the trustees of certain multiemployer pension plans, for the first time, to reduce the monthly sums that they pay to retirees *already in pay status* (meaning that they are receiving monthly payments) if the government approved making those cuts and certain other procedures were followed. Over the past few years, several pension plans have, after receiving the government's express written authorization, reduced accrued pension benefits to participants, including retired participants already in pay status and out of the job market.

3. Such cuts are entirely unprecedented since the dominant pension-law statute, ERISA, was enacted. Even before ERISA, such cuts could only be made if the pension plan reserved the right to do so in its plan documents. Such retroactive cuts—cuts to benefits already earned—are also impermissible without paying compensation to the people whose pensions are cut. Such an action deprives

them of their right to access their own property—their money—held in trust for their benefit. This case challenges the nascent practice of having the government authorize trustees of private pension plans to cut *vested* pension benefits. Such cuts benefit the government by reducing or eliminating the coverage risk of the government's insurance plan.

4. These vested pension payments come not from mere pledges secured by an employer's "IOU". Rather, Plaintiffs' monthly pension comes from actual money held in an actual account for the benefit of specific workers at specified amounts. Each of the Plaintiffs in this lawsuit made important economic decisions, investment choices, career decisions, and family decisions based on the pension benefits guaranteed to them by their employers, by the pension funds that their employers sponsored, and by the plain terms of federal law. These decisions include declining pay increases, turning down other jobs, and declining other pension plans covered by different statutes.

5. Empowering a private party—Plaintiffs' pension fund—to cut these payments, on an indefinite (and, in reality, permanent) basis, is akin to authorizing a trust to refuse to distribute sums to its beneficiaries or entitling an insurance plan to refuse to pay meritorious claims. The government, if it undertakes such a step, must pay fair compensation to the parties who are prevented from accessing their own financial property.

3

6. The pension fund exists solely for the benefit of pension participants, and the government's actions prevent the pension recipients from accessing their own money on the schedule to which they are entitled to access it—and, here, the government did so at least in part, to protect the government-run insurance program that insures plans that fail.

7. Under MPRA (the Act out of which this case arises), Plaintiffs in this lawsuit— and all members of the proposed class—had their vested pensions cut beginning on October 1, 2017, and for nearly all of the plaintiffs, the cut was massive: a 29% reduction, each month, for the rest of their lives. The government authorized these cuts. These cuts could not have happened without the government's actions. The cuts benefited the government and entailed the government shifting a specific pool of money from a specific account from plaintiffs to other private citizens. Plaintiffs are entitled to compensation.

8. Nor can the government purport to be surprised by this outcome. For decades, courts (while upholding cuts to certain *un*-vested pensions) warned the government that cutting vested pensions would be an unlawful taking of property. Plaintiffs intend to show that the government's actions reflect a constitutional violation because, among other reasons, (i) the pension was vested, making it property to which they were entitled, (ii) the government interfered with Plaintiffs' access to their own property, (iii) the effect on

4

Plaintiffs' property was substantial, (iv) the government interfered with Plaintiffs' investment-backed expectation by altering retroactively the legal status of the pension rights that Plaintiffs worked decades to acquire, (v) the burden is inconsistent with Plaintiffs' past experience (given that such changes were illegal for most or all of the thirty-year period during which they worked to earn their pensions, yet the cuts apply retroactively to retirees rather than merely prospectively to active workers), and (vi) indefinite (and, in practice, permanent).

9.  This case will need either to bless the government's ability to take away from retired workers vested, funded pensions for which a government-run entity receives insurance premiums or, alternatively, confirm what courts have long observed: that the government, if it wishes to alter the terms of a vested pension plan, must provide fair compensation.

## JURISDICTION

10. This Court has jurisdiction under 28 U.S.C. § 1491(a), which empowers this Court to hear claims against the United States that (1) rest upon the U.S. Constitution, a federal statute, or federal regulations and (2) seek damages.

11. This Court also has jurisdiction under 28 U.S.C. § 1491(a)(2) to provide limited equitable relief of the sort sought in this Complaint.

12. Plaintiffs seek damages in this litigation only for the uncompensated taking that the government has orchestrated each month since October 2017. Plaintiffs expressly decline to assert in this Complaint any claims for pensions against the defendant.

## PARTIES

13. Plaintiff William "Bill" King resides at 5870 Valley Drive, Jordan, NY 13080.

14. Plaintiff Anthony "Tony" Gugliuzza resides at 8163 Adamello Circle, Clay, NY 13041.

15. Plaintiff Stephen "Steve" Dardzinski resides at 1 Hillsborough Street, Fairport, NY, 14450.

16. Defendant is the United States of America.

## RELATED CASES

17. This case is not, to the best of Plaintiffs' and counsel's knowledge, related to any case previously filed in this Court.

## STATEMENT OF THE CLAIM

18. The "Statement of the Claim" contains three parts. First, it summarizes the general background out of which this litigation arises—the legal landscape from which this suit emerged. Second, it discusses the specific facts that led to the current dispute. Finally, it provides information about the Plaintiffs, the proposed class, and their injuries.

6

## 1. General Background

19. In 1954, a collective bargaining agreement established a pension fund called the New York State Teamsters Conference Pension & Retirement Fund (the "Fund"). The Fund has operated continuously since that time.

20. The Fund is a multiemployer plan, meaning that a number of companies contribute into a single fund. Like other multiemployer plans, the Fund pays retirement benefits to people who worked at one or more participating companies. This multiemployer approach was established by Congress to reduce the risk that retirees from a given company would lose their pensions if one or more of their employers became insolvent.

21. Some multiemployer plans are struggling to meet their future pension obligations. Plaintiffs bear no fault for those struggles.

22. In December 2014, Congress enacted the Kline-Miller Multiemployer Pension Reform Act of 2014 ("Kline-Miller" or "MPRA").

23. MPRA reflected Congress's concern that a governmental insurance program called the Pension Benefit Guaranty Corporation would face harm unless vested pension benefits were cut. For instance, in promoting the bill on Capitol Hill, sponsors in the House of Representatives warned that "the failure of these plans *will bankrupt the Pension Benefit Guarantee* [sic] *Corporation* (PBGC), which

serves as the federal backstop charged with protecting these workers' pensions.") (emphasis added).

24. The law was designed, at least in significant part, to lower the government's insurance costs and to prop up this insurance program, the PBGC. If the PBGC became insolvent, it would have paid hundreds of millions of dollars in claims and the defendant would face crushing political pressure to underwrite any losses beyond the amount that the PBGC could cover. Notably, multiemployer pension plans are required by federal law to pay insurance premiums to the PBGC in order to purchase insurance from the PBGC for retirees' pensions. The PBGC pays retirees whose pension plans cannot meet the plans' financial obligations in amounts greater than certain minimum agreed-upon levels. The government is acting as a market participant by insuring these pensions.

25. The government also shifted hundreds of millions of dollars in wealth from plaintiffs, who have no representation on the Fund's board, to active workers who have significant representation on the Fund's board. The government thereby took specific money from plaintiffs to benefit others.

26. MPRA provides a mechanism under which the trustees of multiemployer pension plans may obtain the government's approval to cut vested, accrued pension benefits—money that Plaintiffs have earned and that is, to put it colloquially, sitting in a trust account for their benefit. This action is akin to

8

allowing trustees of a family trust to reduce how much money they pay each month to the settlor's children each month, in violation of the plain terms of the trust, to increase the amount that goes to the grandkids.

27. Since 1974, however, such cuts were categorically and unambiguously prohibited by federal law.

28. Even aside from federal statutory law, pension recipients had a right to prevent any cuts to their vested pension payments. The Takings Clause prevents the government from voiding this right, for its own benefit or otherwise, without paying fair compensation.

29. MPRA established a system that, as interpreted and applied by the U.S. government, interfered with that right in a manner that amounted to an uncompensated taking.

30. In addition, MPRA caused other constitutional violations and statutory violations not relevant to this litigation.

31. MPRA provides that trustees of a multiemployer plan could apply to the Department of the Treasury (Treasury) to reduce pension benefits, and that such cuts could take effect following various procedures beyond the scope of this Complaint.

**2. Current Dispute**

9

32. In August 2016, the Fund applied for approval from Treasury to cut payments of vested pension benefits. Without such authorization, the Fund was precluded by its own documents and by ERISA's "anti-cutback" rule from cutting vested pensions.

33. The Fund withdrew its application on or around April 5, 2017.

34. On May 15, 2017, the Fund submitted a revised application to Treasury to cut vested pension benefits.

35. The Fund reported to Treasury that it was in critical and declining condition.

36. The application sought to cut vested pension payments to most retired workers by 29%.

37. For "active" workers, the cuts proposed by the Plan's application were lower— 18% rather than 29%.

38. For a subset of retirees (i.e., individuals above the age of 80 or who were disabled), no pension cuts would occur.

39. For another subset of retirees (i.e., individuals between the age of 75 and 80), pension cuts below 29% would occur. A sliding scale would apply.

40. The Fund's application was provisionally approved by the Department of Treasury on or around July 17, 2017. Under MRPA's procedures, however, that provisional approval had no effect without a vote of Plan participants who needed to approve the cuts. Thus, as required by MPRA, Treasury called a vote

of plan participants to seek their approval for implementing the cuts. This approval process—in addition to the quirks discussed below—occurred very quickly, impairing the ability of Plaintiffs and other members of the proposed class from raising concerns about the cuts with Treasury or from blocking the cuts.

41. Treasury reports that it or an approved party sent ballots to roughly 34,000 participants in the Plan.

42. Approximately 14,000 participants voted.

43. The participants who voted rejected the proposed cuts overwhelmingly.

44. Of those who voted, 70.6% opposed the cuts, and only 29.4% approved the cuts.

45. In spite of the more than 2-to-1 margin by which voting participants opposed the cuts, Treasury treated the proposal to cut benefits as having passed.

46. In all, 9,788 participants voted against the reduction. Another 4,081 participants voted for the reduction. Another 20,767 ballots were allegedly delivered but not cast. Treasury treated the vote as succeeding by a 71.7%-to-28.3% margin (i.e., 24,848 to 9,788) rather than as failing by a 70.6% to 29.4% margin. It achieved this result by counting all of the non-votes as votes in favor of the cuts.

47. This approach conflicted with Treasury's own prior interpretation of the law. Specifically, on January 27, 2017, Treasury notified the Iron Workers Local 17

Pension Fund of the results of a vote regarding a proposal to reduce pension benefits. The letter stated, "[a] majority of eligible voters did not vote to reject your benefit suspension. Of the 936 votes *cast*, 616 voted in favor of the benefit suspension, and 320 voted against the benefit suspension. Accordingly, the letter serves as final authorization to suspend benefits . . . ." (Emphasis added).

48. In other words, on at least one occasion, Treasury previously assessed the outcome based on the number of ballots cast not the number of ballots *sent*.

49. Even though a supermajority of voting participants opposed the cuts, an official within the Department of the Treasury sent a letter to the Fund on or around September 13, 2017, authorizing the Fund to cut pensions beginning on October 1, 2017.

50. The letter reported that participants in the Fund would receive a "reduction in benefits," effective October 1, 2017. The cuts were, as noted above, 29% for nearly all retired workers whose pensions were fully vested. The same cut (29%) applied to beneficiaries of deceased workers and workers who were not actively working for an employer sponsor but who were not yet old enough to receive their pensions.

51. Retired workers are impaired from replacing their lost income by the physical demands of the job they once performed, the difficulty of regaining their position, and their health.

52. The pension cuts took effect in October 2017, the first month in which a taking of Plaintiffs' property occurred.

53. Each Plaintiff suffered an additional taking, in an amount equal to the one they each experienced in October 2017, on or around the first day of each subsequent month.

54. In October 2017 and each month since then, Plaintiffs and all members of the proposed class received a pension payment that was either 29% lower than all of their earlier guaranteed and non-reducible pension payments or more than 0% but less than 29% if they were above age 75. (The Complaint also asserts an alternative class definition: for this alternative class, Plaintiffs and all members of the proposed class received cuts to their vested pensions of exactly 29%.)

### 3. Plaintiffs' Injuries and Class Allegations

55. Plaintiff Bill King is 70 years old. For approximately thirty years, King worked exclusively for UPS, except from 1999 to 2001 during which he worked for the union itself. He drove trucks, loaded trucks, unloaded trucks, performed air recovery, and completed other obligations.

56. ERISA's anti-cutback rule was in effect at all times that King worked for UPS. It was in effect until a decade after he retired.

57. The pension became increasingly important to King as he grew older. He was offered, in or around 1983, an opportunity to serve as Transportation Director

for the West Genesee school district. He declined the position largely because of the guaranteed pension that he was earning by working at UPS. King refrained from looking for jobs during his time as a UPS employee largely because of the pension guarantee. Over time, the pension became the dominant reason that King stayed in his job rather than looking for another position with a higher salary.

58. King believed what he was told by individuals at the pension fund and his employer: the pension was, in King's paraphrasing of what he understood based on those discussions, "the amount you get for life."

59. King's work was, for the vast majority of his career as a UPS employee, physically demanding. King obtained his license to drive trucks because, while still in his thirties, he began experiencing knee pain. King was committed to showing up to work even when he was sick because he did not want to risk his pension benefits or delay the time when he would begin receiving them. He noticed colleagues behaving in the same way.

60. In 2002, King returned to physical work rather than a desk job, and he continued that role until he retired in mid-2008.

61. King began receiving pension payments in 2008. His pension has been both fully vested and paid since then—and has been uncuttable since then. Before

14

retiring, he confirmed with the Plan that his pension would be fully guaranteed and could not be reduced. He relied on these representations.

62. Before joining UPS in December 1988, Plaintiff Stephen Dardzinski, now aged 69, had a job without a pension. He left that job to work at UPS because obtaining a pension was critical to him. He worked for UPS as a mechanic before retiring in 2011. At UPS, he worked the night-shift and was often unable to take vacations before the Christmas holidays, whereas his previous job (the one without a pension) enabled him to be home by 5:30 PM on nearly all nights and did not restrict his vacations. The change in hours and in the physical demands of the work—the job at UPS was far more taxing—had serious consequences for Dardzinski's health and his relationship with his family. He was willing to make these sacrifices in exchange for the pension he was earning.

63. Dardzinski will testify that, during his time working for UPS, it was common knowledge that once a retired employee started collecting pension benefits, those benefits could not be cut unless the fund had failed. UPS emphasized proudly that the pension plan was a compelling reason to join UPS or to stay at UPS. Further, Fund documents provided to Dardzinski specifically stated that his pension could not be cut and was guaranteed. As UPS suggested, Dardzinski emphasized these pension benefits to his family whenever he had discussions

15

with them about the stress and extraordinary time commitments of his job. In taking the job at UPS, remaining at UPS, and retiring when he did, Dardzinski relied on these representations. Because of the importance to Dardzinski of the UPS-related pension benefits he was earning and the legal protections they had, Dardzinski did not entertain other job opportunities while working at UPS.

64. Plaintiff Anthony Gugliuzza began working at UPS in or around 1971. He retired in or around 2001. He became aware during his time at UPS that his pension was guaranteed by federal law. He has been ill in recent months and is not in good enough health to work. He has suffered from depression. His wife has needed to take a part-time job to help the family make ends meet. In Gugliuzza's words the cuts are "hurting me bad."

65. When Plaintiffs took or continued in their jobs, they relied on the guarantees against vested pensions being cut.

66. When Plaintiffs decided to stay in their jobs, they relied on the guarantees against vested pensions being cut.

67. Plaintiffs relied on written representations from officials at their employer or the Plan, or both, that a vested pension could not be cut.

68. Plaintiffs relied on oral representations from officials at their employer or the Plan, or both, that a vested pension could not be cut.

16

69. Plaintiffs invested in their pensions with their labor: they stayed at their jobs, refrained from exploring other possibilities, and/or declined other professional opportunities in material part because of the guarantee of a secure, uncuttable pension. They each expected that they would receive the full sum of the pension. If the pension could not be paid indefinitely, they expected that they would receive payments until the Fund was depleted, at which point they would receive guaranteed payments from the Pension Benefit Guaranty Corporation.

70. During the vote on the proposed cuts, Plaintiffs cast timely ballots against the cuts.

71. Beginning on or around October 1, 2017, the monthly pension payment that each Plaintiff received was reduced by 29%.

72. The cuts were inconsistent with their past experience. Vested benefits had not been cut at any time during their careers. Until years after Plaintiffs retired, cuts of vested benefits were prohibited by federal law barring plan insolvency.

73. The reduction in pension payments that Treasury authorized involved cutting benefits of theirs that were fully vested.

74. Money that has been paid into the Fund is managed by and invested by the Fund for the benefit of Plaintiffs and the proposed class, among others. That money is not merely some vague future promise. There is actual money—over

17

one billion dollars—sitting in actual accounts, and that money is held, invested, and administered by the Fund for the benefit of Plan participants.

75. Plaintiffs have faced significant economic harm from the cuts.

76. Until September 2017, Plaintiff King received a monthly pension of approximately $4,281.25. Beginning in October 2017 and for each month thereafter, he received a monthly pension of approximately $3,039.69.

77. The other Plaintiffs have lost roughly the same amount of money from their monthly pension. Other members of the proposed classes have lost significant sums, too. Some of those amounts are higher than for Plaintiffs and some are lower. But as described throughout the complaint they were harmed by the same government action at the same time under the same statute.

## PROPOSED CLASS

78. Plaintiffs seek to certify a class under Rule 23 of this Court's rules defined as follows, but as modified by sub-classes, information learned during discovery, and the Court's good judgment and commitment to producing a just result:

> all individuals (excluding active employees in companies that are plan participants) whose vested monthly pension from the New York State Teamsters Conference Pension & Retirement Fund was reduced on or after October 1, 2017.

79. The term "monthly pension" is intended to refer to any pension that was vested or protected by ERISA's anti-cutback rule, or both, at any time during the individual's work for a company that participated in the Plan.

80. This proposed class includes participants in the Plan whose pensions were cut by 29%.

81. This proposed class includes beneficiaries (which generally refers to surviving spouses of Plan participants) whose pensions were cut by 29%.

82. This proposed class includes any other individuals whose pensions from the Plan were cut by 29%, whether or not they had begun receiving pension payments from the Plan as of October 1, 2017 (e.g., people who quit their union job and who have a vested pension with the Plan but had not yet begun collecting it as of October 1, 2017).

83. This proposed class includes all retired individuals who were, as of October 1, 2017 (or such other date as used by the Plan in imposing cuts) between 75 and 80 years old and received a pension cut of more than 0% but less than 29%.

84. This proposed class excludes "active workers" whose pensions were cut by 18%.

85. This proposed class excludes plan participants age 80 or older at the time the cuts took effect (because they did not experience a cut and therefore did not experience an economic injury from the Defendants' actions).

86. Plaintiffs respectfully ask the Court to use case management techniques, including sub-classes and class narrowing or refining of the above wording to

produce a class that, even if it is not identical to that provided in the proposed definition above, produces a just result.

87. In the alternative, Plaintiffs seek to certify the following class:

> all individuals whose monthly pension from the New York State Teamsters Conference Pension & Retirement Fund was, beginning on October 1, 2017, reduced by 29%.

88. More than seventy individuals meeting either of the above class definitions have already retained counsel. They will be added to the case in the coming weeks.

89. Moreover, as of 2017, approximately 35,150 men and women participate in the Fund, the majority of whom fit into the above class definitions. Based on the information filed by the Fund, the class would comprise approximately 21,250 plan participants. The class would be several thousand people smaller if the alternative definition were used.

90. All of the members of the proposed class face a common question: were their pensions cut through an uncompensated taking? Additionally each (1) earned a pension that vested, (2) believed that the pension was guaranteed or would have so believed if they had researched ERISA's anti-cutback rule or Plan documents, (3) worked for a majority of their time as an employee of an Employer Sponsor of the Fund during an era when, under federal law (ERISA's anti-cutback rule), their pension benefit could not be reduced, (4) can

reasonably be assumed to have taken the job because of, stayed at the job because of, or refrained from looking for other professional opportunities and/or retired when they did at least in significant part because of the pension benefit, (5) had their pension lowered in the wake of and because of Treasury's decision to approve cuts, or (6) some combination of the five considerations just mentioned sufficient to create commonality.

91. In the alternative to the commonalities just mentioned (but in addition to the central question of whether a taking occurred), the members of the proposed class have issues in common with one another because their pension was cut on exactly the same day and authorized by exactly the same division of the U.S. government following exactly the same procedures as to all class members.

92. For the alternative class definition, each member of the proposed class had his or her pension cut by exactly the same amount, too, each month (i.e., 29%) in addition to the common issues just mentioned in the Paragraphs 90, 91, 93 or 95.

93. The claims of Plaintiffs are typical of the claims of the proposed class insofar as they each had a vested pension. The named plaintiffs worked for multiple decades during which vested pensions could not be cut. Each of them had his pension cut 29% because of the government's actions. The government action, for all the proposed class members, either was or was not an uncompensated

21

taking. Moreover, for the vast majority of the proposed class, their pension was cut by 29%. For those between ages 75 and 80, their claims can be resolved through a sub-class, or the court could certify the class only for individuals whose pensions were cut by 29%, though that would likely leave those men and women between the ages of 75 and 80 without relief.

94. The representative plaintiffs will work vigorously to advance the interests of all members of the proposed class. They were chosen by counsel because they are fair, knowledgeable, trusted by their peers, and committed to resolving this issue.

95. The defendant has acted on grounds that apply to the entire proposed class. In particular, it protected its own financial interests (by shielding the Pension Benefit Guaranty Corporation from needing to pay claims) by cutting vested pensions of members of the proposed class, and engaged in an uncompensated taking in the process.

96. As for all facts stated herein, the defendant is liable, responsible, and accountable for the actions taken by its agencies, including the Department of the Treasury, either in all instances or, at a minimum, for purposes of the facts alleged in this Complaint.

97. Aside from a class action, no practicable way exists to compensate the men and women who were harmed by Defendant's actions.

98. The issues for which the proposed class seeks a remedy predominate—in fact, they completely dominate. As noted above, every class-member will have an identical or nearly identical legal question located at the heart of their claim: did the government owe them just compensation for cutting their pension benefits? Numerous other facts also predominate, as noted in Paragraphs 90 to 95.

## CLAIMS FOR RELIEF

### Claim 1: Constitutional Claim (Takings Clause)

99. Plaintiffs, on behalf of themselves and the proposed class, incorporate by reference and re-allege each and every allegation contained in Paragraphs 1-98 as though fully set forth herein.

100.   Plaintiffs, on behalf of themselves and the proposed class, allege that the Defendant engaged in an unlawful, uncompensated taking of property. Plaintiffs, on behalf of themselves and the proposed class, seek damages from Defendant equal to the total sum by which each Plaintiff's and each class-member's pension payment has been reduced or such other amount as reflects, in accordance with the Takings Clause, just compensation.

101.   In the alternative, the Defendant's action qualifies as an illegal exaction of property belonging to or existing for the benefit of Plaintiffs and members of the proposed class.

102.   Plaintiffs and members of the proposed class meet the requirements of

*Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), other cases about pensions,

and the inherent rights established by the Fifth Amendment to receive just

compensation for the government's actions.

103.   The above claims apply to the alternative-class if the proposed class is found

not to be suitable for certification.

## Claim 2: Declaratory Judgment

104.   Plaintiffs, on behalf of themselves and the proposed class, incorporate by

reference and re-allege each and every allegation contained in Paragraphs 1-103

as though fully set forth herein.

105.   Plaintiffs seek a declaratory judgment (or such other order or injunction as

this Court deems appropriate and within its powers) that, based on Claim 1, the

Defendant is liable to Plaintiffs and members of the proposed class for

prospective reductions in the value of the pension benefits of Plaintiffs and

members of the proposed class.

## Prayer for Relief

WHEREFORE, Plaintiffs demand judgment in their favor, and in favor of the

Class, against Defendant United States of America as follows:

A. Finding and deciding that Defendant has taken and/or illegally exacted

the property of Plaintiffs and members of the proposed class;

24

B. Determining and awarding to Plaintiffs and members of the proposed class fair compensation for the damages sustained to them as a result of any and all the violations by Defendant of such rights as are mentioned in (A) in this Prayer for Relief, above;

C. Awarding to Plaintiffs and members of the proposed class the costs and disbursements of this action, including reasonable attorney's fees and experts' fees, costs, and expenses;

D. Determining that this action may be maintained as a class action and certifying a class in accordance with the rules of this Court;

E. Finding that Plaintiffs each meet the requirements of a class representative and may maintain this section as a representative of the Class;

F. Certifying a class in accordance with the proposed definition offered in Paragraph 78 above or, in the alternative, that which is proposed in Paragraph 87 above (or such alternative definition as the Court concludes is appropriate and in the interests of achieving a fair and just result for harmed individuals, including, if necessary, a failsafe class);

G. Certifying appropriate sub-classes, as needed, including for individuals between ages 75 and 80 at the time that pension cuts took effect for whom their pensions were cut by less than 29% and/or individuals whose

25

pensions had vested but who had not yet begun to receive pension

payments as of October 1, 2017;

H. Awarding and adding to any judgment, pre-judgment, and post-judgment

interest, together with any and all further costs, disbursements, and

reasonable attorney's and expert's fees;

I. Issuing a declaratory judgment, order, or other equitable remedy

requiring Defendant to pay, prospectively, an appropriate amount to

Plaintiffs and members of the proposed class if Defendant elects not to

rescind the approval for the Fund to pay reduced pension payments to

Plaintiffs and members of the proposed class.

Dated:    Washington D.C.
          July 30, 2018

                                    By    _____
                                          Noah A. Messing
                                          Attorney of Record
                                          MESSING & SPECTOR LLP
                                          333 E. 43rd St.
                                          Lobby 1
                                          New York, NY 10017
                                          Tel. (212) 960-3720
                                          Email: nm@messingspector.com